

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 2:19-CR-118-Z |
| LINDSAY CLARE WILLIAMS | |

## FACTUAL RESUME

In support of Lindsay Clare Williams' plea of guilty to the offense in Count One of the Information, Williams, the defendant, Chuck Lanehart, the defendant's attorney, and the United States of America (the government) stipulate and agree to the following:

## ELEMENTS OF THE OFFENSE

To prove the offense alleged in Count One of the Information, charging a violation of 18 U.S.C. § 371, that is, Conspiracy to Commit Bank Fraud, the government must prove each of the following elements beyond a reasonable doubt:

Conspiracy to Commit Bank Fraud[1]

*First.* That the defendant and at least one other person made an agreement to commit the crime of bank fraud, as charged in the Information;

*Second.* That the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and

*Third.* That one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the Information, in order to accomplish some object or purpose of the conspiracy.

---

[1] Fifth Circuit Pattern Jury Instruction 2.15A (5th Cir. 2015 ed.).

**Lindsay Clare Williams**
**Factual Resume—Page 1**

Bank Fraud[2]

*First.*   That the defendant knowingly executed a scheme or artifice;

*Second.*   That the scheme or artifice was to defraud a financial institution, as alleged in the Information;

*Third.*   That the defendant had the intent to defraud the financial institution;

*Fourth.*   That the scheme or artifice to defraud was material, employed a false material representation, or concealed a material fact; and

*Fifth.*   That the defendant placed the financial institution at risk of civil liability or financial loss.

## STIPULATED FACTS

1. Lindsay Clare Williams admits and agrees that beginning on or about a date unknown and continuing until on or about July 27, 2018, in the Amarillo Division of the Northern District of Texas, and elsewhere, Lindsay Clare Williams, defendant, did knowingly and willfully combine, conspire, confederate, or agree with others, persons known or unknown to the United States, to commit bank fraud, in violation of Title 18, United States Code, Sections 1344(1), with knowledge of the unlawful purpose of the agreement. All in violation of Title 18, United States Code, Section 371.

2. In 2013, Lindsay Clare Williams was hired by Reagor Dykes Auto Group (RDAG), and she later became a group accounting manager.

3. On or about February 1, 2018, the Amarillo office of the Federal Bureau of Investigation received information that RDAG was engaged in fraudulent activity. The FBI began investigating the allegations and learned that Shane Smith, RDAG CFO,

---

[2]Fifth Circuit Pattern Jury Instruction 2.58A (5th Cir. 2015 ed.).

**Lindsay Clare Williams**
**Factual Resume—Page 2**

Williams, and other co-conspirators were involved with an extensive check-kiting scheme involving at least 19 accounts located at several banks including, but not limited to, the following: 1) FirstCapital Bank of Texas (FCBTX); 2) AimBank; 3) FirstBank & Trust; 4) IBC Bank; 5) Liberty Capital Bank; 6) Peoples Bank; 7) Vista Bank; and 8) Branch Banking and Trust Company (BB&T). The deposits of all eight banks are insured by the Federal Deposit Insurance Corporation (FDIC).

4. "Check-kiting" is a systematic scheme to defraud, whereby nonsufficient checks are traded or cross deposited between two or more checking accounts in order to artificially inflate the bank account balances. This is accomplished by using the float time in the bank system. Once bank accounts are artificially inflated, checks that would normally be returned for nonsufficient funds are, in fact, paid or honored by the issuing banks. There are no actual goods or services provided in exchange for a kited check, nor is there a legitimate or well-documented loan between the two account holders. The purpose of the check-kiting is to falsely inflate the balances in two or more checking accounts in order to allow payroll checks, vendor checks, and other legitimate debits to clear. In this way, rather than negotiable instruments, checks are misused as a form of unauthorized credit.

5. The FBI interviewed several witnesses. These witnesses said RDAG was under-capitalized due to its aggressive growth and acquisitions of new dealerships, above-market employee compensation, and unnecessary overhead. To compensate, RDAG kited intercompany checks to falsely inflate its account balances. The FBI learned in its investigation that the check-kiting scheme grew over time and, just prior to

the collapse on June 26, 2018, RDAG had an entire team at its headquarters designated to kite checks.

6. The FBI investigation revealed that by July 2018, at least 19 accounts, from several banks, involving nine different RDAG entities, had been utilized to kite checks. The accounts were identified as kite accounts by one or more of the following indicators: (1) intercompany checks with no apparent legitimate business purpose were being deposited into and drawn on the accounts on a daily basis, (2) the aggregate amount of intercompany checks being deposited into an account was roughly equal to the aggregate amount of intercompany checks being drawn on that account for a given time period, (3) there was a significant or exponential increase in the monthly dollar volume of intercompany checks leading up to the collapse, (4) there was a negative account balance or a large chargeback after the collapse, and/or (5) the account was identified as a kite account by witnesses or co-conspirators.

7. Williams admits she and her co-conspirators kited checks through these 19 accounts to falsely inflate the daily balances of RDAG's accounts. Those 19 accounts were as follows:

| Account # | Bank | Name on Account |
|---|---|---|
| XXXXX1179 | AimBank | Reagor-Dykes Motors LP |
| XXXXX 3183 | AimBank | Reagor-Dykes Snyder LP |
| XXXXX02177610 | BB&T | Reagor-Dykes Snyder LP Funding Account |
| XXXXX 15978 | FirstBank & Trust | Reagor Auto Mall Ltd |
| XXXXX 991 | FCBTX | D and R Acquisitions LLC - Real Estate |
| XXXXX 144 | FCBTX | Reagor Auto Mall Ltd |
| XXXXX 488 | FCBTX | Reagor-Dykes Amarillo LP |

**Lindsay Clare Williams**
**Factual Resume—Page 4**

| XXXXX 013   | FCBTX               | Reagor-Dykes Floydada LP           |
|-------------|---------------------|------------------------------------|
| XXXXX 31714 | IBC Bank            | D and R Acquisitions LLC           |
| XXXXX 31811 | IBC Bank            | Reagor-Dykes Auto Company LP       |
| XXXXX 31838 | IBC Bank            | Reagor-Dykes Imports LP            |
| XXXXX 31846 | IBC Bank            | Reagor-Dykes Amarillo LP           |
| XXXXX 31862 | IBC Bank            | Reagor-Dykes Plainview LP          |
| XXXXX 32117 | IBC Bank            | D and R Acquisitions LLC           |
| XXXXX 34    | Liberty Capital Bank | Reagor-Dykes Auto Direct of Dallas |
| XXXXX 8379  | Peoples Bank        | Reagor-Dykes Snyder LP             |
| XXXXX 93    | Vista Bank          | Reagor-Dykes Auto Company LP       |
| XXXXX 94    | Vista Bank          | Reagor-Dykes Imports LP            |
| XXXXX 88    | Vista Bank          | Reagor-Dykes Plainview LP          |

8. Two of the 19 accounts that were used to kite checks belonged to Reagor Auto Mall (RAM). The FBI interviewed witnesses about the checks that went back and forth between the two RAM accounts at FirstBank & Trust and FCBTX. The FirstBank & Trust account had blue check stock, while the FCBTX account had red check stock. The bank accounts usually had negative balances in the morning, sometimes as low as negative $900,000. After Smith was notified of the anticipated legitimate deposits for that day, he would instruct other co-conspirators the total amount to cut from one account to the other account by the end of the day, usually by sending an email such as "put 550k of blue" (blue referring to the color of the checks) or whatever was needed. The co-conspirators made up random amounts for each check to total the amount provided by Smith. The bank accounts usually showed positive balances again by the end of each day due to these checks.

9. Some of the emails the FBI recovered show Smith and co-conspirators discussing the check-kiting scheme, specifically an email on October 2, 2017, where a RDAG employee emailed Smith: "$298090.59. How much in blue checks today?" Smith

replied, "$280k or more." On December 20, 2017, an RDAG employee emailed Smith "$215k." Smith replied, "Time to change up what we have been doing!! $450k blue checks." For example, on July 25, 2018, there were 117 distinct items totaling $5,449,912.80 that were deposited into FCBTX account XXXXX144. Sixty-six of those 117 items, totaling $4,262,104.20, were intercompany checks or transfers from other RDAG entities. Some of the intercompany transactions were possibly legitimate, but most were not. There were ten checks totaling $582,145.00 from FirstBank & Trust account XXXXX15978 deposited into FCBTX account XXXXX144 on July 25, 2018. All ten checks were for whole dollar amounts with no cents. On that same date, July 25, 2018, there were 154 checks or other debit items totaling $4,502,114.36 that cleared FCBTX account XXXXX144. Sixty-six of those checks or other debit items totaling $3,582,216.99 were intercompany checks to other RDAG entities. A few of the intercompany checks listed were legitimate, but most were not. There were ten checks totaling $526,716.00 that were written to RAM. All ten checks were for whole dollar amounts with no cents. Compare this figure to the ten checks totaling $582,145.00 from FirstBank & Trust account XXXXX15978 deposited into FCBTX account XXXXX144 on July 25, 2018. The similar amounts going back and forth on the same day is indicative of check-kiting.

10. Two other accounts that were used to kite checks belonged to Reagor-Dykes Amarillo LP, and Williams was an authorized signer on both accounts. FCBTX account XXXXX488 titled "Reagor-Dykes Amarillo LP" was opened on August 9, 2015. Deposit and withdrawal activity in FCBTX account XXXXX488 rose exponentially. Deposits rose from $4,765,521.40 during the month of February 2017 to a peak of $30,873,930.74 in

March 2018. IBC Bank account XXXXX31846 titled "Reagor-Dykes Amarillo LP" was opened on July 17, 2017. Deposit and withdrawal activity in IBC Bank account XXXXX31846 also rose exponentially. Deposits rose from zero in February 2018 to a peak of $29,725,256.68 in July 2018. Much of the increased deposit and withdrawal activity in these accounts can be attributed to intercompany checks.

11. Some of the emails the FBI recovered show Williams and co-conspirators discussing the check-kiting scheme. For example, on March 24, 2017, Williams emailed the following instructions to the Amarillo location:

> "Good morning! Shane wanted me to email you and ask if you could please cut about $320k in checks to RDAC and $320k to RDT and send them with a runner early this morning. We will be depositing checks for Amarillo today to offset. I know it's short notice, but if your runner could leave by 11 or 11:15, we would really appreciate it. Thank you so much!"

Moreover, on September 25, 2017, Williams emailed the following instructions to the Amarillo store: "Can you please cut 450k in checks to Snyder and send them with a runner ASAP this morning? Please cut from account 1106 controlled by 13443. Thank you!!"

12. Once the kite collapsed, 33 intercompany checks totaling $1,639,799.00, which were all drawn on FCBTX account XXXXX144 titled "Reagor Auto Mall Ltd," and all of which had been deposited into FirstBank & Trust account XXXXX15978 titled "Reagor Auto Mall Ltd" in the latter days of July 2018, were returned to FirstBank & Trust by FCBTX due to "uncollected funds hold." The 33 returned checks were dated between July 26, 2018 and July 30, 2018. The collapse of the kite resulted in a balance of -$1,402,586.47 in RAM's FCBTX account XXXXX144 as of August 31, 2018, and a balance of -$1,595,395.83 in RAM's FirstBank & Trust account XXXXX15978 as of

August 19, 2018. The kite collapse also resulted in a balance of -$333,175.79 in FCBTX account XXXXX488 as of August 31, 2018, and a balance of -$1,205,333.63 in IBC Bank account XXXXX31846 as of August 31, 2018.

13. As of April 17, 2019, the actual loss due to the check-kiting scheme for the 19 accounts is as follows:

| Account # | Bank | Name on Account | Estimated kite loss |
|---|---|---|---|
| XXXXX1179 | AimBank | Reagor-Dykes Motors LP | 0.00 |
| XXXXX 3183 | AimBank | Reagor-Dykes Snyder LP | -1,922,279.10 |
| XXXXX02177610 | BB&T | Reagor-Dykes Snyder LP Funding Account | 0.00 |
| XXXXX 15978 | FirstBank and Trust | Reagor Auto Mall LTD | -1,595,395.83 |
| XXXXX 991 | FCBTX | D and R Acquisitions LLC - Real Estate | 0.00 |
| XXXXX 144 | FCBTX | Reagor Auto Mall Ltd | 0.00 |
| XXXXX 488 | FCBTX | Reagor-Dykes Amarillo LP | -333,175.79 |
| XXXXX 013 | FCBTX | Reagor-Dykes Floydada LP | -105,487.80 |
| XXXXX 31714 | IBC Bank | D and R Acquisitions LLC | -2,678,971.00 |
| XXXXX 31811 | IBC Bank | Reagor-Dykes Auto Company LP | -705,133.48 |
| XXXXX 31838 | IBC Bank | Reagor-Dykes Imports LP | -57,854.44 |
| XXXXX 31846 | IBC Bank | Reagor-Dykes Amarillo LP | -1,205,333.63 |
| XXXXX 31862 | IBC Bank | Reagor-Dykes Plainview LP | -703,657.91 |
| XXXXX 32117 | IBC Bank | D and R Acquisitions LLC | -160,563.44 |
| XXXXX 34 | Liberty Capital Bank | Reagor-Dykes Auto Direct of Dallas | 0.00 |
| XXXXX 8379 | Peoples Bank | Reagor-Dykes Snyder LP | 0.00 |
| XXXXX 93 | Vista Bank | Reagor-Dykes Auto Company LP | -4,122,621.72 |
| XXXXX 94 | Vista Bank | Reagor-Dykes Imports LP | -5,319,002.00 |
| XXXXX 88 | Vista Bank | Reagor-Dykes Plainview LP | -4,180,097.56 |
| | | total: | -23,089,573.70 |

14. After many RDAG entities filed for bankruptcy, BlackBriar Advisors LLC became the Chief Restructuring Officer for the RDAG bankruptcy cases. According to D. Lyndon James, the Acting Chief Financial Officer, "Williams has been instrumental in helping BlackBriar understand the automobile dealership business, the operations of the various Reagor Dykes dealerships, and the complex administrative process of the industry." Moreover, according to James, Williams has assisted RDAG customers with "obtaining or regaining legal rights to the vehicles they purchased or the ones they traded in," "[t]he floor plan lenders . . . have relied heavily on [] Williams to support their efforts to recover vehicles and/or compensation for vehicles that belonged to them pre-bankruptcy," and "Williams has been the key contact within the team with retail automotive lenders concerning vehicles they have funded."

[Remainder of page intentionally left blank.]

15. The defendant agrees that the defendant committed all the essential elements of the offense(s). This factual resume is not intended to be a complete accounting of all the facts and events related to the offense charged in this case. The limited purpose of this statement of facts is to demonstrate that a factual basis exists to support the defendant's guilty plea to Count One of the Information.

AGREED TO AND STIPULATED on this 23rd day of September, 2019.

ERIN NEALY COX
UNITED STATES ATTORNEY

_____
LINDSAY CLARE WILLIAMS
Defendant

_____
CHUCK LANEHART
Attorney for Defendant

_____
JOSHUA FRAUSTO
Assistant United States Attorney
West Texas Deputy Branch Chief
Texas State Bar Number 24074228
500 South Taylor Street, Suite 300
Amarillo, Texas 79101-2446
Telephone: 806-324-2356
Facsimile: 806-324-2399
E-mail: joshua.frausto@usdoj.gov

**Lindsay Clare Williams**
**Factual Resume—Page 10**